UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

RODNEY JOSEPH,

                              Plaintiff,                              <u>DECISION AND ORDER</u>

                                                                                          09-CV-6428L

                    v.

BRIAN FISCHER,
Commissioner of New York State Department
of Correctional Services,
et al.,

                              Defendants.
_____

       Plaintiff Rodney Joseph, an inmate in the custody of the New York Department of Corrections and Community Supervision ("DOCCS"), commenced this action on August 24, 2009. Plaintiff has sued a number of DOCCS employees, asserting several claims based primarily on his allegation that defendants have violated plaintiff's right to practice his religion in violation of the First Amendment to the United States Constitution and the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. §§ 2000cc et seq. Plaintiff seeks declaratory and injunctive relief as well as money damages.

       Defendants have moved to dismiss the complaint pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. For the reasons that follow, that motion is granted in part and denied in part.

## BACKGROUND

       The forty-page amended complaint alleges that plaintiff is a practicing member of an organization or entity known as the Nation of Gods and Earths ("NGE"). The complaint provides

few details of the tenets or practices of this group, but in support of his claims, plaintiff relies in part on decisions from the Southern District of New York in another case involving NGE. One of those decisions, *Marria v. Broaddus* ("*Marria I*"), No. 97 Civ. 8297, 2003 WL 21782633 (S.D.N.Y. July 31, 2003), summarized the NGE belief system in some detail. *See id.* at *1 - *4. In short, NGE, whose adherents are commonly referred to as "Five Percenters," "traces its roots to the Black Muslim movement that emerged in the midtwentieth century and most directly to the Nation of Islam," which is classified by DOCCS as a religion. *Id.* at *1.

In *Marria*, District Judge Naomi Buchwald, following a bench trial, held that NGE is a "religion" for purposes of RLUIPA, and that the inmate plaintiff's beliefs based on his adherence to NGE teachings were religious in nature. The court therefore directed DOCCS (which was then known as the Department of Correctional Services, or DOCS) to conform its policies concerning NGE to the court's findings and rulings in *Marria*. *Id.* In response to that decision, DOCS adopted certain protocols concerning NGE ("Protocols"), which were approved by the court in a subsequent opinion and order. *See Marria v. Broaddus* ("*Marria II*"), 2004 WL 1724984 (S.D.N.Y. July 30, 2004).[1]

In the case at bar, plaintiff alleges that during his confinement at Attica Correctional Facility, defendants have interfered with his practice of his beliefs. He alleges that defendants have confiscated from him written materials relating to NGE, that they have prevented him and other NGE members from congregating with or talking to other inmates about NGE, and that they have

---

[1]"In general, a federal court may take judicial notice of the decisions of another court." *Beechwood Restorative Care Ctr. v. Leeds*, ___ F.Supp.2d ___, 2012 WL 1252533, at *5 (W.D.N.Y. Apr. 13, 2012) (citing *520 South Michigan Ave. Associates, Ltd. v. Shannon*, 549 F.3d 1119, 1138 n. 14 (7th Cir. 2008), *cert. denied*, 130 S.Ct. 197 (2009), and *Mihos v. Swift*, 358 F.3d 91, 100 (1st Cir. 2004)). In addition, "while courts generally do not consider matters outside the pleadings, they may consider documents attached to the pleadings, documents referenced in the pleadings, or documents that are integral to the pleadings in order to determine if a complaint should survive a 12(b)(6) motion." *Smart v. Goord*, 441 F.Supp.2d 631, 637 (S.D.N.Y. 2006) (internal citation and quotation marks omitted). *See also Sowell v. Northrop*, 820 F.Supp.2d 475, 476 (W.D.N.Y. 2011) (court applies same standards to Rule 12(c) motion as to Rule 12(b)(6) motion). Inasmuch as plaintiff relies on the decisions in *Marria*, then, this Court may consider those decisions in deciding defendants' motion to dismiss.

otherwise not granted NGE members the same rights and privileges as members of other faith groups. Plaintiff alleges that defendants have thereby violated his rights under the First Amendment and RLUIPA.

Though the religion-based claims make up the bulk of plaintiff's claims, he also asserts that defendants have interfered with his right of access to the courts. Specifically, he alleges that defendants confiscated, or prevented plaintiff from receiving, certain documents relating to a proceeding in New York State Surrogate's Court in which plaintiff was involved. Plaintiff also alleges that some of the defendants' actions were motivated by a desire to retaliate against him, because of his complaints concerning defendants' alleged violations of his rights and other matters.

## DISCUSSION

### I. Motions to Dismiss under Rule 12(c)

"In deciding a Rule 12(c) motion, [courts] apply the same standard as that applicable to a motion under Rule 12(b)(6). Under that test, a court must accept the allegations contained in the complaint as true, and draw all reasonable inferences in favor of the non-movant." *Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir. 1994). However, "a plaintiff's obligation ... requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *accord Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

### II. Application to this Case
### A. Religion Claims: General Principles

Prisoners enjoy some degree of constitutional protection under the Free Exercise Clause of the First Amendment. *Pell v. Procunier*, 417 U.S. 817, 822 (1974); *Jackson v. Mann*, 196 F.3d 316,

320 (2d Cir. 1999). Such rights, however, are balanced against the "interests of prison officials charged with complex duties arising from administration of the penal system." *Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir. 1990).

A prisoner's free exercise claim is therefore "judged under a 'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." *Farid v. Smith*, 850 F.2d 917, 925 (2d Cir. 1988) (quoting *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987)); *see also Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003). Thus, a prison regulation that impinges upon an inmate's practice of his religion may nonetheless be valid, if it is reasonably related to legitimate penological interests. *Turner v. Safley*, 482 U.S. 78, 89 (1987); *Farid v. Smith*, 850 F.2d at 925. The application of this lower standard is consistent with the notion that "evaluation of penological objectives is committed to the considered judgment of prison administrators, 'who are actually charged with and trained in the running of the particular institution under examination.'" *O'Lone*, 482 U.S. at 349 (quoting *Bell v. Wolfish*, 441 U.S. 520, 562 (1979)).

The Second Circuit has set forth a three-part inquiry by which to assess free exercise claims. A court considering such a claim should determine "(1) whether the practice asserted is religious in the person's scheme of beliefs, and whether the belief is sincerely held; (2) whether the challenged practice of the prison officials infringes upon the religious belief; and (3) whether the challenged practice of the prison officials furthers some legitimate penological objective." *Farid v. Smith*, 850 F.2d at 926.

Prisoners' religious rights are also safeguarded by RLUIPA, which "protects institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation for exercise of their religion." *Cutter v. Wilkinson*, 544 U.S. 709, 723 (2005). RLUIPA provides that

> [n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person –

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc–1(a).

A prisoner can establish a RLUIPA violation by proving that the prison regulation or policy at issue imposes a "substantial burden" on his religious exercise without promoting a compelling governmental interest that is advanced through the least restrictive means. RLUIPA, then, "imposes a higher burden than does the First Amendment in that the statute requires prison regulators to put forth a stronger justification for regulations that impinge on the religious practices of prison inmates." *McFaul v. Valenzuela*, 684 F.3d 564, 575 (5th Cir. 2012) (internal quotation marks omitted).

Although RLUIPA does not define "substantial burden," the Second Circuit has stated that "[s]ince substantial burden is a term of art in the Supreme Court's free exercise jurisprudence we assume that Congress, by using it, planned to incorporate the cluster of ideas associated with the Court's use of it." *Westchester Day School v. Village of Mamaroneck*, 504 F.3d 338, 348 (2d Cir. 2007) (citations omitted). The Supreme Court has held that a substantial burden is one that "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 718 (1981) (*quoted in Westchester Day School*, 504 F.3d at 348).

**III. Plaintiff's Religion Claims**

**A. Equitable Relief**

Applying those standards to the case before me, I conclude that plaintiff's claims relating to his membership in NGE are sufficient to withstand a motion to dismiss, at least insofar as plaintiff seeks equitable relief.

As the court in *Marria* noted, RGE adherents are entitled to protection under both the First Amendment and RLUIPA. The court in that case stated that although NGE and its members were

themselves reluctant to call NGE a "religion," "the law of the Free Exercise Clause does not turn on mere semantic distinctions." *Marria I*, 2003 WL 21782633, at *11. After reviewing some of the tenets of NGE, both in general and as expressed by the individual plaintiff in *Marria*, the court concluded that the plaintiff's beliefs as a member of NGE were "both sincere and 'religious in nature' and therefore entitled to RLUIPA and First Amendment protection under the free exercise clause." *Id.* at *12. *See also Wright v. Fayram*, No. C11-0001, 2012 WL 2312076, at *11-*12 (N.D.Iowa June 18, 2012) (finding that "NGE has fundamental religious indicia" and concluding that plaintiff's "beliefs in the NGE are sufficiently religious to require First Amendment protection"), *Report and Recommendation adopted*, 2012 WL 2838366 (N.D.Iowa July 10, 2012).

In compliance with *Marria*, DOCCS has recognized NGE's status as a protected religious group; the Protocols grant certain rights to "[a]ny inmate who professes to be a sincere religious adherent of the Nation of Gods and Earths ... ." *Marria II*, 2004 WL 1724984, at *2. At the same time, however, the Protocols do not grant NGE members the full panoply of rights afforded to members of other faiths. Perhaps most notably, although the Protocols allow an NGE inmate "to meet one-on-one in the facility legal visiting room during normal visiting hours" with an officially designated outside NGE volunteer, *see id.* at *3, they do not otherwise provide for congregative activities by NGE members.

In support of their motion to dismiss, defendants argue that the relief sought by plaintiff is inconsistent with the Protocols. They note, for instance, that the NGE materials that defendants are alleged to have confiscated were apparently authored by plaintiff himself, *see* Complaint at 11 (alleging that defendants confiscated "the Plaintiff's Lessons and Literature (written by the Plaintiff)"), whereas the Protocols only provide for the possession of certain specified materials and other documents and literature that have been "identified by an outside Nation of Gods and Earths organization as having religious significance for sincere adherents ..." and approved by DOCCS. *See Marria II*, 2004 WL 1724984, at *3. Defendants also note that some of the relief that plaintiff seeks (such as allowing an outside NGE member to "enter the facility as a Religious Advisor and

hold congregation for cultural activities ...," *see* Complaint at 36, involves the kind of congregative activity that is not permitted under the Protocols.

It is true that the Southern District in *Marria II* did "accept[]" and "adopt[]" the Protocols, *see* 2004 WL 1724984, at *2. That decision, which was rendered over eight years ago, is not binding on this Court, however, and whether the relief requested by plaintiff is consistent with the Protocols is not dispositive of his claims in this action.

In a case in the Northern District of New York challenging some of these same restrictions on NGE activity, that court recently denied summary judgment for DOCCS and DOCCS officials, holding that the defendants had not provided the court with enough information to allow the court to determine whether some of DOCCS's current restrictions on NGE activities were adequately justified by legitimate security or other penological concerns to pass muster under the First Amendment and RLUIPA. *See Panayoty v. Annucci*, ___ F.Supp.2d ___, 2012 WL 4450822 (N.D.N.Y. Aug. 16, 2012), *Report and Recommendation adopted sub nom. Bonilla v. Annucci*, 2012 WL 4378127 (N.D.N.Y. Sept. 25, 2012).

The court in *Panayoty* granted summary judgment for the defendants as to the plaintiffs' First Amendment and RLUIPA claims based upon the restrictions on displaying NGE symbols, Universal Flag, and texts, but denied summary judgment as to the plaintiffs' First Amendment and RLUIPA claims based upon DOCCS's restrictions on NGE congregative opportunities and on NGE members wearing crowns, as well as on the plaintiffs' equal protection claims. As to the former, the court stated that based upon its review of the documents submitted by both sides, DOCCS's restriction against displaying NGE symbols and texts did not burden the plaintiffs' free exercise of religion, and that "nothing before us establishes that such display is a central part of being an NGE adherent." *Id.* at 9.

The court went on to find, however, that DOCCS' restrictions on wearing crowns and on NGE congregative activity "infringe[] the Plaintiffs' sincerely held beliefs, and for RLUIPA purposes, substantially burden their ability to practice their beliefs." *Id.* The court further held that

- 7 -

the defendants had not demonstrated a sufficient basis for their purported security concerns underlying those restrictions, and stated that "the conclusory statements offered to support the Defendants' stance of security/budget woes are insufficient to meet, as the moving party, the Defendants' burdens of production as well as persuasion ... ." *Id.* at *12.

In addition, the court denied summary judgment for the defendants on the plaintiffs' equal protection claims, stating that "at this stage, there is no showing to this Court as to why, today, NGE adherents are still being treated differently than other religions recognized by DOCCS." *Id.* at *13. The court stated that "because of the Protocols, NGE adherents, despite being recognized as a valid religion for First Amendment purposes, are excepted from virtually every accommodation made for other validly recognized religion," and that, "because the Defendants ha[d] provided no evidence by which we can assess the reasonableness of their restrictive Protocols," the court could not grant summary judgment in the defendants' favor. *Id.*

With respect to the *Marria* action, the court in *Panayoty* stated that there was no basis for the defendants' assertion that the doctrine of *stare decisis* warranted adherence to the *Marria* court's approval of the Protocols. The court noted that *stare decisis* is "not applicable to coordinate courts, *i.e.*, district courts located in different judicial districts," *id.* at *6, and that the doctrine of *stare decisis* was therefore inapplicable in the context of the *Panayoty* action. *Id.*

The court further stated that defendants had "not provide[d] a scintilla of evidence, new or old, of the security concerns at issue, but instead categorically state[d] that they exist and urge[d] this Court to simply adopt the same findings made by District Judge Buchwald in 2004" in *Marria*. *Id.* at *11. As the court in *Panayoti* pointed out, however, the *Marria* court itself acknowledged that "while we, the judiciary, are directed to defer to prison officials on security matters," prison officials "'cannot merely brandish the words "security" and "safety" and expect that their actions will automatically be deemed constitutionally permissible conduct.'" *Id.* (quoting *Marria I*, 2003 WL 21782633, at *14). Stating that "we are being asked to blindly rule in favor of the Defendants based upon evidence that was submitted to another judge almost nine years ago," the *Panayoty* court added

that "it cannot be overlooked that much has changed since Judge Buchwald ultimately approved the Protocols in 2004." *Id.* In particular, the court noted that several of the measures approved by Judge Buchwald in *Marria II* had been opposed by DOCCS on security grounds, but there was no evidence before the court in *Panayoty* that the adoption of those measures had led to any security problems of the sort anticipated by DOCCS. *Id.*

I agree with the *Panayoty* court that the mere fact that some of the relief sought by plaintiff may go beyond what is provided for by the Protocols is not in itself dispositive of the viability of his claims, notwithstanding the approval of the Protocols in *Marria*. Again, the fact that another district court approved the Protocols in 2004 does not bind this Court, nor, for that matter, would it bind the court that issued the *Marria* decisions. As the court in *Panayoty* stated, that fact that it is not the defendants' burden to prove the validity of the Protocols, *see id.* at *12, does not mean that the Court should blindly rely on or rubber-stamp the Protocols either, particularly in light of the amount of time that has passed since they were adopted.

It is also worth pointing out that in *Marria*, the Protocols were only approved after a bench trial, and that the court in *Panayoty* denied DOCCS's motion for summary judgment, in support of which the defendants had submitted materials outside the pleadings, including a declaration by the DOCCS Executive Deputy Commissioner. In contrast, what is before me now is a motion to dismiss, based solely on the pleadings. The Supreme Court's *Twombly* and *Iqbal* decisions may have tightened pleading standards, but the standard on a Rule 12(c) motion remains less stringent than the standards applicable to a summary judgment motion or a full-blown trial. *See Dansler-Hill v. Rochester Inst. of Tech.*, 764 F.Supp.2d 577, 581 (W.D.N.Y. 2011) ("Unlike motions for summary judgment, which employ shifting evidentiary burdens and require the parties to produce supporting evidence in admissible form, analysis of [a] motion [to dismiss] is guided solely by the pleadings and the documents incorporated therein by reference, wherein the truth of plaintiff's allegations is presumed").

At this point, then, I am not prepared to rule as a matter of law, based on the face of the amended complaint, that defendants' alleged confiscation of NGE-related materials from plaintiff was justified by legitimate security concerns, or that it did not impinge upon plaintiff's right to freely exercise his religion. In addition, while plaintiff does not specifically allege that he has expressly sought from DOCCS certain other relief that he seeks here (such as the right to congregate with other NGE members), it is apparent that any such request would be denied, by virtue of the Protocols. Defendants do not argue that plaintiff lacks standing to challenge the Protocols, but only that his claim fails because the relief that he seeks is not provided for by the Protocols. Under these circumstances, it would be a pointless exercise to require plaintiff to request of DOCCS that he be allowed to engage in congregative activities with other NGE members before he can file suit challenging DOCCS's prohibition of such activity. *See Palmieri v. Town of Babylon*, 277 Fed.Appx. 72, 75 n.2 (2d Cir. 2008) (noting that the general rule requiring a plaintiff who challenges an allegedly unconstitutional policy to first submit to the policy may be excused where plaintiff shows that it would have been futile to seek to be excused from application of the policy); *see also Lac Vieux Desert Band of Lake Superior Chippewa Indians v. Mich. Gaming Control Bd.*, 172 F.3d 397, 407 (6th Cir. 1999) (finding that "given the First Amendment context ... a facial challenge is appropriate, and any need for [a party] to participate in the allegedly unconstitutional ... process in order to establish standing is obviated"); *Desert Outdoor Adver., Inc. v. City of Moreno Valley*, 103 F.3d 814, 818 (9th Cir. 1996) (finding that advertising companies "have standing to challenge the [municipal sign] permit requirement, even though they did not apply for permits, because applying for a permit would have been futile").

None of this is meant to imply that plaintiff *is* necessarily entitled to the relief that he seeks. Indeed, the Court remains "mindful of the well-established judicial tradition of giving heightened deference to the experience and judgment of prison officials on such central issues in the context of inmate First Amendment claims." *Marria I*, 2003 WL 21782633, at *14 (internal quotation marks omitted); *see also Ford v. McGinnis,* 352 F.3d 582, 595 (2d Cir. 2003) ("Even assuming Ford can

show that his free exercise rights have been burdened, ... the refusal to provide him with [a certain religious feast] is excusable if the decision was supported by legitimate penological interests"). Nonetheless, it is simply not possible, based solely on the pleadings in this action, to determine whether defendants' actions have unjustifiably burdened plaintiff's religious exercise. Defendants' motion to dismiss plaintiff's First Amendment and RLUIPA claims for equitable relief is therefore denied.

While plaintiff's claims for prospective equitable relief are not barred, then, those claims will be permitted to continue only against defendant Brian Fischer in his official capacity as the Commissioner of DOCS. Any such relief awarded against Fischer will effectively bind the other defendants as well. *See Murray v. Fischer*, 820 F.Supp.2d 472, 474 (W.D.N.Y. 2011); *Nevarez v. Hunt*, 770 F.Supp.2d 565, 568 (W.D.N.Y. 2011).

**B. Claims for Damages**

Although I conclude that plaintiff may therefore proceed with his claims for equitable relief, insofar as he challenges the Protocols and DOCCS policies regarding NGE, I also find that to the extent that plaintiff seeks to hold the individual defendants liable for damages, his claims must be dismissed on the ground of qualified immunity.

The qualified immunity doctrine shields government officials from liability for civil damages where their performance of their discretionary duties does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). *See also Malley v. Briggs*, 475 U.S. 335, 341 (1986) (qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law").

In order to be clearly established, "'[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.' The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v.*

*Katz*, 533 U.S. 194, 202 (2001) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). An official cannot be held personally liable for taking action that he or she reasonably, but mistakenly, believes is lawful. *See Anderson*, 483 U.S. at 641 (discussing reasonable but mistaken determinations of probable cause).

Here, the acts complained of, concerning the holding of study group classes, the wearing of certain articles of clothing or emblems, and the observance of NGE holy days, at the very least were not objectively unreasonable under the state of the law as it existed at the relevant time. Given the terms of the DOCCS Protocols concerning NGE–which, as stated, have been approved by the Southern District–defendants could reasonably have believed that their actions were lawful. The individual defendants are therefore entitled to dismissal of the damages claims against them on that ground. *See Ciempa v. Jones*, 745 F.Supp.2d 1171, 1203-04 (N.D.Okla. 2010); *Hardaway v. Haggerty*, No. 05-70362, 2007 WL 2868098, at \*6 (E.D.Mich. Aug. 8, 2007), *Report and Recommendation adopted*, 2007 WL 2868100 (E.D.Mich. Sept. 27, 2007).

**IV. Denial of Access to the Courts**

Plaintiff also alleges that he was denied his constitutional right of access to the courts, due to defendant's confiscation or destruction of certain documents regarding an action that plaintiff was litigating in Surrogate's Court.

Prison inmates do have a general right of access to the courts. In order to state a claim for a violation of that right, however, a plaintiff must do more than make cursory allegations that some legal papers were taken from him. Rather, "a plaintiff must allege that the defendant took or was responsible for actions that 'hindered [his] efforts to pursue a legal claim.'" *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003) (quoting *Monsky v. Moraghan*, 127 F.3d 243, 247 (2d Cir. 1997)). For a defendant's conduct to provide a basis for an inmate to invoke his right of access to the courts, then, that conduct must cause "actual injury" or "materially prejudice" the inmate. *Edwards v. Horn*, No. 10 Civ. 6194, 2012 WL 760172, at \*6 (S.D.N.Y. 2012); *Jacobs v. Quinones*, No.

1:10–cv–02349, 2011 WL 3555734, at *9 (E.D.Cal. Aug. 11, 2011) (plaintiff failed to state cognizable claim for denial of access to the courts, where he alleged that he was denied the right to send "legal mail" and was not allowed to communicate with his lawyers or the courts, but failed to allege any actual injury as a result).

In addition, like any claim, a claim for denial of access to the courts must meet the plausibility standard of pleading that has been established by the Supreme Court. *See Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 680-81 (2009). *See, e.g.*, *Moore v. Ramsey*, No. 8:09-1770, 2010 WL 1945669, at *2 (D.S.C. Apr. 14, 2010) (plaintiff's claim regarding tampering with his legal mail failed because he did not allege any specifics regarding the legal mail, except to state it was a letter from the court, and he did not state what, if any, adverse consequences he suffered as a result), *Report and Recommendation adopted*, 2010 WL 1945661 (D.S.C. May 13, 2010). Plaintiff's conclusory allegations do not meet that standard, as he has failed to show what prejudice he suffered as a result of defendants' alleged actions.

In any event, the constitutional right of access to the courts "is limited to cases in which inmates 'attack their sentences, directly or collaterally, and ... challenge the conditions of their confinement. Impairment of any other litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration.'" *Tormasi v. Hayman*, 443 Fed.Appx. 742, 745 n.3 (3d Cir. 2011) (quoting *Lewis v. Casey*, 518 U.S. 343, 355 (1996)). *See also Simmons v. Sacramento Cnty. Super. Ct.*, 318 F.3d 1156, 1159-60 (9th Cir. 2003) (explaining that "a prisoner has no constitutional right of access to the courts to litigate an unrelated civil claim"). Since the proceedings at issue here apparently related to an action concerning the estates of plaintiff's late aunt and grandfather, and were wholly unrelated to plaintiff's own conviction or incarceration, he has not stated a claim under this theory.

**V. Retaliation**

Lastly, plaintiff alleges that defendants retaliated against him in a number of ways because of his various complaints concerning NGE, the prison law library, and other matters. He alleges, for instance, that his job assignment as a porter was taken from him, and that certain items were seized from his cell in retaliation for his complaints.

In order to state a valid retaliation claim, plaintiff must allege that his actions were protected by the Constitution, and that such "conduct was a substantial or motivating factor for the adverse actions taken by prison officials." *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003) (citations omitted). Thus, there must be a "causal connection between the protected speech and the adverse action." *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004) (citation omitted).

"A plaintiff cannot state a retaliation claim in wholly conclusory terms, but rather, must provide a pleading that is 'supported by specific and detailed factual allegations.'" *Anderson v. Lapolt*, No. 07–CV–1184, 2009 WL 3232418, at *5 (N.D.N.Y. Oct. 1, 2009) (quoting *Friedl v. City of New York*, 210 F.3d 79, 85–86 (2d Cir. 2000)); *see also Sawyer v. Jowers*, No. 2:08–CV–0186, 2008 WL 4791557, at *6 (N.D.Tex. Oct. 31, 2008) ("To state a claim of retaliation, the inmate must allege more than his personal belief that he is the victim of retaliation. Conclusory allegations of retaliation are not sufficient; the plaintiff must [allege facts] from which retaliation may plausibly be inferred"). In addition, because of the ease with which such claims can be made that the Second Circuit has directed district courts to approach prisoner retaliation claims "with skepticism and particular care." *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001).

In the case at bar, plaintiff's retaliation claims fail for several reasons. As to plaintiff's allegation concerning his prison job, plaintiff's allegation that his job assignment as a porter was taken away from him for retaliatory reasons, *see* Amended Complaint at 29, is utterly conclusory and speculative. *See Brown v. Mache*, 233 Fed.Appx. 940, 941 (11th Cir. 2007) ("Although Brown did engage in protected conduct by filing his grievances, Brown provides no facts indicating that the [job] reassignment was retaliatory"). While I recognize that defendants' Rule 12(c) motion must be

decided based only on the pleadings, plaintiff must still allege enough facts to lend some plausibility to his assertion that retaliation was a motivating factor behind this job reassignment. He has not done so. *See Pezant v. Gonzalez*, No. 1:11–cv–00564, 2012 WL 2160111, at *4 (E.D.Cal. June 13, 2012) ("Plaintiff's conclusory allegations that he was validated and kept in administrative segregation because he filed prison grievances or because of the ideology of the materials he possessed are insufficient to state a plausible claim for retaliation in violation of the First Amendment") (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Furthermore, there are no allegations indicating that plaintiff's job change was an adverse act that would support a retaliation claim. *See Brown v. Craven*, 106 Fed.Appx. 257, 258 (5th Cir. 2004) (prisoner's retaliation claim was properly dismissed, given the absence of any assertion by plaintiff that his new job was less desirable).[2]

Plaintiff also alleges that his cell was searched in retaliation for his having filed complaints concerning the prison law library. Such allegations do not show adverse action, however, particularly in light of the fact that plaintiff was ultimately found guilty of several charges stemming from the search. *See Dorsey v. Fisher*, 2012 WL 811350, at *1 (2d Cir. Mar. 13, 2012) (allegations that correction officer ordered or otherwise conducted searches of plaintiff's cell were insufficient to show adverse action that would support a claim of retaliation); *Craven*, 106 Fed.Appx. at 259 (since plaintiff was convicted of possession of contraband, and there was no evidence that alleged contraband had been legitimately obtained by plaintiff, his claim based on search of his cell and seizure of contraband was properly dismissed).

---

[2] In that regard, I note that in a prior action (arising out of similar but separate events from those underlying this case) that plaintiff filed in the Southern District of New York, the court noted that plaintiff had "complained that he was told the only job assignment he would receive while at Attica was one working the 'lawns & grounds or porter.'" *Joseph v. Fischer*, No. 08 Civ. 2824, 2009 WL 3321011, at *5 (S.D.N.Y. Oct. 8, 2009). In other words, in that action, plaintiff had complained that being a porter was an *un*desirable job assignment.

The Southern District granted summary judgment for the defendants in that action, on various grounds. *See id.* at *9 - *19.

**CONCLUSION**

Defendants' motion for judgment on the pleadings (Dkt. #32) is granted in part and denied in part. Defendants' motion is granted as to all of plaintiff's claims, and all of plaintiff's claims are dismissed, except for his claims for injunctive and other prospective equitable relief under the Free Exercise Clause of the First Amendment and the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), which may proceed only against defendant Brian Fischer, the Commissioner of DOCCS, in his official capacity. In all other respects, defendants' motion is denied.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
October 24, 2012.